DA 10-0638

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2011 MT 216

PATRICK and PAMELA SMITH,

      Plaintiffs and Appellants,

  v.

FARMERS UNION MUTUAL INSURANCE
COMPANY,

      Defendant and Appellee.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DV 10-458(C)
Honorable Ted O. Lympus, Presiding Judge

COUNSEL OF RECORD:

      For Appellants:

          E. Casey Magan; Russell Scott Waddell; Waddell & Magan, P.C.;
Bozeman, Montana

      For Appellee:

          Douglas J. Wold; Wold Law Firm, P.C.; Polson, Montana

                    Submitted on Briefs:  June 1, 2011

                              Decided:  August 30, 2011

Filed:

_____
                          Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1      Plaintiffs Patrick and Pamela Smith (the "Smiths") appeal the judgment of the Eleventh Judicial District Court, granting Defendant Farmers Union Mutual Insurance Company's ("FUMIC") motion for summary judgment and denying plaintiffs' motion for partial summary judgment.  The following issues are presented on appeal:

¶2      *1.   Whether the District Court erred in granting summary judgment to FUMIC.*

¶3      *2.   Whether the District Court erred in denying Smiths' motion for partial summary judgment.*

¶4      We reverse the District Court on the first issue, and affirm the court's ruling on the second issue.

### FACTUAL AND PROCEDURAL BACKGROUND

¶5      At all times relevant to this lawsuit, the Smiths resided at their home on Winterhawk Drive in Bigfork, Montana.  In late 2007, they purchased a homeowner's insurance policy on the residence from Wayne Treweek, a FUMIC agent in Kalispell.  A separate insurance policy covered a larger, second home the Smiths were in the process of building at another site on the property.  This initial policy term ran from December 13, 2007, to December 13, 2008.  FUMIC elected to offer the Smiths the option to renew their policy on identical terms, and sent an offer in late October to the Smiths, instructing them to mail a renewal payment by December 13, 2008, and to contact Treweek with any questions or concerns.  The renewal declaration stated that "[t]o insure continuous coverage we must receive your payment in our office prior to the

2

due date shown above." The Smiths failed to remit payment to Treweek or to FUMIC by the December 13 due date.

¶6 On December 18, FUMIC terminated its contract with Treweek to sell FUMIC insurance products. It sent a letter the next day to Treweek's customers, including the Smiths, to inform them of the cessation of the relationship. Smiths do not deny receiving this letter. On December 18, FUMIC sent the Smiths a Lapse Notice (hereafter sometimes referred to as the "offer to reinstate"), stating that their policy had lapsed because of nonpayment of the renewal premium, and offering to reinstate the policy with no lapse of coverage if the Smiths submitted payment by December 28, 2008. Despite the contemporaneous termination of FUMIC's relationship with Treweek, the Lapse Notice listed Treweek as the Smiths' agent and required receipt of payment by FUMIC "or by the agent." The Lapse Notice did not specify the method of payment, nor specific addressee to which payment must be submitted—it merely stated that "payment" must be "received" by the due date. Treweek's address alone was listed on the notice; the envelope itself listed FUMIC's address and included a pre-addressed payment envelope addressed to FUMIC as well, according to affidavit testimony. Smiths dispute that a pre-addressed envelope was included. The notice also stated that if payment was received after December 28, it would be at FUMIC's sole discretion whether or not to reinstate the policy. Because December 28 fell on a Sunday, the operative date for timely receipt of the payment was Monday, December 29.

¶7 On Friday, December 26, Patrick Smith phoned Treweek's office to inquire about making a payment on the policy to ensure it would not lapse. Lori Gibson, an employee

3

in Treweek's office, informed Smith that Treweek was no longer a FUMIC agent, and that Smith should mail his payment to the "home office." Smith avers that he does not recollect the instruction to mail payment directly to FUMIC. In any case, on that Friday, December 26, Smith purchased a money order with cash from Glacier Bank in Kalispell for the minimum premium payment of $176.00, made the money order out to "MFU Insurance Agency" as directed by the notice, and mailed the money order to Treweek's office. Smith's name was typed directly on the money order, but the space for "Purchaser Signer for Drawer" was left blank. On the back of the money order, a section entitled "Purchaser's Agreement" states: "You, the purchaser, agree to immediately complete this Money Order by filling in the front of the Money Order, signing it, and addressing it at the bottom. The terms of this Money Order bind you, your heirs, or others who receive this Money Order from you." Smith stated that he was not instructed to sign the money order, and did not know that his signature was expected as he had sent unsigned money orders in the past that a related Farmer's Union company had accepted, and some money orders, such as those issued by the U.S. Postal Service, do not contain a signature line. The drawer of the money order was MoneyGram Payment Systems, Inc., a Minneapolis corporation in the money order business; the drawee was listed as Boston Safe Deposit & Trust Co. out of Massachusetts.

¶8 On Monday, December 29, 2008, Patrick Smith drove to Kalispell to run errands, and stopped by Treweek's office to confirm that his payment had been received. Terri Saubert, an employee at Treweek's office, located the envelope Smith had sent the previous Friday in the stack of mail delivered moments prior. Saubert called the Great

4

Falls FUMIC office while Smith talked with Lori Gibson, with whom he had initially discussed sending the payment. Saubert reached Terri Humble, a Great Falls FUMIC employee, who informed her that although the policy was scheduled to be canceled that day, the 29th, to go ahead and send the payment to the Great Falls office. Humble testified via affidavit that she instructed Saubert to send the payment in "for review"; Saubert has no recollection of this qualified acceptance and testified via affidavit that she would have inquired further if she had heard such a statement, as the direction to send a payment "for review" would have been unusual. Saubert testified via affidavit that based on past practices, if there were any question of nonacceptance of the payment, she would have been transferred directly to Humble's supervisor Bill Zins. Based on Humble's statements and FUMIC's past practices, Saubert informed Smith that FUMIC had accepted his payment and that continuing coverage had been procured. Following Humble's directions, Saubert mailed Smith's envelope to the Great Falls FUMIC office later that day. It was received the following day, Tuesday, December 30.

¶9    Smith returned from his errands in Kalispell on December 29 to find the Creston Volunteer Fire Department hosing down the charred skeleton of the house he had just returned from insuring. Smith immediately submitted a claim to FUMIC and was referred to claims adjuster Rial Gunlikson. Gunlikson had Smith sign a form authorizing FUMIC to conduct its own investigation of the fire, in addition to that conducted by the Creston fire department. Both investigations concluded that the fire's accidental cause was a meat smoker in active use in the garage.

5

¶10    After FUMIC's on-site investigation concluded on January 5, 2009, Smith called Gunlikson to check on the insurance proceeds, as the family was temporarily residing in their camper. Gunlikson indicated to Smith over the phone that there was a problem with his payment. FUMIC followed this conversation up with a letter from counsel informing Smith of denial of coverage, dated January 8, 2009, and returned Smith's money order the following day. The stated reasons for denial were that payment "was to be received in the company's Great Falls office by December 28, 2008 . . . but payment was not delivered on a timely basis"; that the money order was not signed, "which is a prerequisite of both the issuing bank and Montana law in order to constitute a valid negotiable instrument"; and that the damaged house was the "secondary" house and FUMIC's underwriting policies require insurance on the "primary" house also to be purchased through FUMIC "in order to have coverage in place for the secondary residence."

¶11    The Smiths filed suit, asserting that no reasonable basis in fact or law existed for denial of the claim. The Smiths' Complaint sought damages arising from the denial of coverage and a declaratory judgment that the loss was covered. The Smiths advanced numerous legal theories under which FUMIC would be held to have timely accepted payment, including the "mailbox rule"; acceptance imputed to FUMIC through Treweek's receipt of payment as FUMIC's agent, under theories of ambiguity and estoppel; acceptance or at least promissory estoppel via Humble's oral direction to Treweek's office staff to go ahead and send the payment to Great Falls; and acceptance as evidenced by FUMIC's conduct in processing the claim after the loss occurred. The

6

Smiths also disputed FUMIC's claim that the unsigned money order was an invalid form of payment. The Smiths moved for partial summary judgment with respect to their declaratory judgment action. FUMIC responded with a cross-motion for summary judgment, seeking a declaratory judgment that the loss was *not* covered. FUMIC disputed all of Smiths' theories of acceptance of payment and reiterated that the unsigned money order was ineffectual. The parties filed reply briefs, engaged in discovery, disclosed witnesses, and filed numerous evidentiary and procedural motions. On December 14, 2010, the District Court issued the order granting FUMIC's motion for summary judgment and denying the Smiths' motion, concluding that no coverage existed for the loss as a matter of law.

¶12 The District Court's grant of the motion stemmed from a number of legal conclusions bearing on the parties' claims. The court first concluded that the Smiths had notice, both via a letter from FUMIC and orally from Lori Gibson at Treweek's office, that Treweek was no longer an agent of FUMIC; and therefore, the Smiths' belief that payment could be submitted to Treweek was unreasonable. The court thus concluded that Treweek's receipt of the money order could not be imputed to FUMIC as a timely acceptance of the offer. The court refused to consider Humble's alleged oral acceptance of the payment, deeming it hearsay and disregarding Smiths' arguments on that point as unsupported by admissible evidence. The court also concluded that the unsigned money order was not valid consideration, basing this conclusion on the order's failure to qualify as a negotiable instrument under Montana law and its noncompliance with the stated terms on the order itself. Given that the Smiths' payment was received after the effective

7

due date of December 29, and was not a valid payment even had it arrived on time, the court concluded that summary judgment was appropriate in FUMIC's favor. The court did not explicitly discuss some of the legal theories advanced by Smiths, such as the "mailbox rule" and the theory that FUMIC's conduct in investigating the fire should operate as an admission of the existence of a contract. The court impliedly rejected these arguments, however, in finding FUMIC's late receipt of the payment dispositive.

¶13 Smiths now appeal the grant of FUMIC's motion for summary judgment and the denial of their motion.

## STANDARD OF REVIEW

¶14 We review a district court's grant or denial of a motion for summary judgment de novo. *Park Place Apts., L.L.C. v. Farmers Union Mut. Ins. Co.*, 2010 MT 270, ¶ 11, 358 Mont. 394, 247 P.3d 236. Applying the criteria contained in M. R. Civ. P. 56, we determine whether the moving party has established both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Goettel v. Est. of Ballard*, 2010 MT 140, ¶ 10, 356 Mont. 527, 234 P.3d 99. All reasonable inferences that may be drawn from the evidence should be drawn in favor of the party opposing summary judgment. *Patch v. Hillerich & Bradsby Co.*, 2011 MT 175, ¶ 11, 361 Mont. 241, __ P.3d ___.

¶15 We review evidentiary rulings made in the context of a summary judgment proceeding de novo, and need not defer to the judgments and decisions of the district court, in order to determine whether evidentiary requirements for summary judgment have been satisfied. *In re Est. of Harmon*, 2011 MT 84, ¶ 14, 360 Mont. 150, 253 P.3d

8

821; *PPL Mont., LLC v. State*, 2010 MT 64, ¶ 85, 355 Mont. 402, 229 P.3d 421; *Lorang v. Fortis Ins. Co.*, 2008 MT 252, ¶¶ 52-53, 345 Mont. 12, 192 P.3d 186 ("in the context of summary judgment, a decision to categorically exclude certain evidence from consideration is not a discretionary function[.]").

## DISCUSSION

¶16 ***Whether the District Court erred in granting summary judgment to FUMIC.***

¶17 Resolution of this question requires an analysis of the District Court's rulings on two principal sub-issues: whether the court erred in concluding FUMIC did not receive timely payment and whether the court erred in concluding the money order constituted an invalid form of payment. In addressing the first of these two primary sub-issues, we consider whether Treweek's receipt of the payment can be imputed to FUMIC; whether the Smiths timely sent payment by virtue of the "mailbox rule"; whether FUMIC's conduct operates as a binding admission as to the existence of an insurance contract or estops FUMIC from denying the existence of a contract; and whether Humble's statements on December 29 are admissible and what impact they may have on the propriety of summary judgment if so. In addressing the second of these issues—whether the money order was a valid form of payment—we consider whether the money order was invalid by its own terms or otherwise invalid under Montana law. The third basis for FUMIC's denial of coverage—the "secondary" nature of the destroyed home—is not before us in this appeal.

¶18    *Whether the District Court erred in concluding that FUMIC did not receive timely payment.*

¶19    We first consider the Smiths' contention that FUMIC timely accepted their payment. The first theory the Smiths advance in support of this point is that Treweek's timely receipt of the payment should be imputed to FUMIC, despite the fact that he was no longer FUMIC's agent at the time. We first note the parties' disagreement over the District Court's characterization of this issue. The Smiths complain the District Court knocked down a straw man version of their argument and failed to consider their true contentions on the merits. They assert the court did so by reframing the issue to focus on Treweek's ostensible agency, as opposed to whether FUMIC's listing of Treweek as "AGENT" on its offer and direction to mail payment to "the agent" created an ambiguity that must be construed against FUMIC. We agree with FUMIC and the District Court, however, that the principle of contract law relied upon by the Smiths—that ambiguities in a contract must be construed against the drafter, codified in § 28-3-206, MCA—is not applicable here, regardless of whether any ambiguities existed, because the very *existence* of the contract is at issue, not the interpretation of any particular term. Ambiguities in alleged contractual *formation* do not come within the ambit of the rule, because an *offer* is not a *contract*. This distinction renders the principle relied upon by the Smiths inapposite. Thus, the District Court correctly focused on whether the Smiths had a reasonable belief that the offer could be accepted by submitting payment to Treweek, thereby allowing the Smiths' timely submission of payment to Treweek to be imputed to FUMIC. As the District Court recognized, the determinative inquiry is whether it was

10

reasonable for the Smiths to submit their payment to FUMIC to Treweek's office. *Semenza v. Kniss*, 2008 MT 238, ¶ 23, 344 Mont. 427, 189 P.3d 1188 (citing *Turjan v. Valley View Estates*, 272 Mont. 386, 394, 901 P.2d 76, 82 (1995)) (belief as to ostensible agency relationship must be reasonable).

¶20    While we recognize that the timing of FUMIC's severance of Treweek's agency introduced a trying element in the Smiths' attempts to continue their insurance coverage, we cannot agree with the Smiths that this occurrence allowed them to submit their premium payment to an office they were aware was no longer affiliated with FUMIC. Although the offer to reinstate suggested payment could be "received by [FUMIC] or by the agent," and listed Treweek as "AGENT," the dispositive inquiry is whether the Smiths' belief that Treweek was an agent of FUMIC was reasonable. We concur with the District Court's resolution of this question. Any uncertainty as to whether Treweek remained FUMIC's agent as of the date Patrick Smith mailed the payment had been conclusively resolved by direct statements made to the Smiths, both in writing and orally. The Smiths do not dispute that they received the letter sent out to all of Treweek's FUMIC policyholders on December 19, 2008, explicitly stating that Treweek was no longer FUMIC's agent; nor do they contest that Lori Gibson, Treweek's employee, orally informed Patrick Smith before he mailed the payment that Treweek's office was no longer affiliated with FUMIC and could not accept the payment. Any dispute as to the content of these communications does not change the simple fact that Smith was aware of the cessation of FUMIC and Treweek's business relationship. We conclude this knowledge must defeat a finding of ostensible agency, and affirm the District Court's

11

conclusion that the Smiths failed to present sufficient evidence to raise a genuine issue for trial on the question of an actual or ostensible agency relationship. Therefore, we uphold the District Court's determination that Treweek's timely receipt of the premium payment—without more—does not impute the timely receipt of payment to FUMIC.

¶21 The second theory advanced by the Smiths is that acceptance was effective as of the date Patrick Smith mailed the premium payment—the so-called "mailbox rule." Under this theory, *either* Smith's own mailing of the payment to Treweek, on Friday the 26th, *or* Treweek's mailing of the payment to FUMIC, on Monday the 29th, operates as a valid acceptance of the offer to reinstate coverage. The District Court impliedly rejected this theory, and we agree it has no weight in the correct analysis here. Even assuming arguendo that the rule applies (which its paper-thin resume in Montana jurisprudence might question), the offer's express terms render the rule inapplicable. The dispositive fact in this analysis, as secondary sources relied upon by the Smiths make clear, is that the offer explicitly states "payment" must be "received" to constitute acceptance of the offer—and express terms trump the possible application of the general rule. *Restatement (Second) of Contracts* § 63 (1981). *See e.g. Butkovich v. Industrial Commn.*, 690 P.2d 257, 259 (Colo. App. 1984).

¶22 Third, the Smiths argue FUMIC's actions and conduct in investigating the claim amount to a binding admission that a contract of insurance existed, or should estop FUMIC from denying the contract's existence. As with the Smiths' "mailbox rule" theory, the District Court impliedly rejected this argument in granting FUMIC's motion for summary judgment. We concur in this implied conclusion as well. FUMIC is

12

statutorily required to conduct "a reasonable investigation based upon all available information" before refusing to pay an insurance claim. Section 33-18-201(4), MCA. Barely a week had passed before FUMIC issued the letter denying liability. FUMIC merely complied with its statutory duties, and the argument by the Smiths that such compliance constituted an admission by FUMIC is misplaced.

¶23 Finally, the Smiths argue the District Court erred in disregarding the conversation between Terri Humble and Terri Saubert on December 29, wherein Humble allegedly informed Saubert that the payment would be accepted if mailed by Saubert to the Great Falls office. The District Court determined that any statement allegedly made during this conversation constituted inadmissible hearsay, and as such could not be considered. The Smiths argue that statements made by FUMIC's admitted agent, Terri Humble, are categorically *not* hearsay under M. R. Evid. 801(d)(2). The rule provides:

> (d) Statements which are not hearsay. A statement is not hearsay if:
> . . . (2) Admission by party-opponent. The statement is offered against a party and is . . . (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of that relationship[.]

¶24 The Smiths point to FUMIC's statement in its Amended Answer that all actions allegedly taken by Humble "were performed in the course of [her] employment and that FUMIC is legally responsible therefore [sic][.]" Thus, the Smiths contend Humble's alleged statements to Saubert are admitted by FUMIC to have been within the scope of Humble's employment, made during her employment, and are therefore not hearsay under Rule 801(d)(2)(D). *See e.g. C. Haydon v. Mont. Mining Props.*, 286 Mont. 138,

148-49, 951 P.2d 46, 52-53 (1997); *Moore v. Menasha Corp.*, 724 F. Supp. 2d 795, 805 (W.D. Mich. 2010).

¶25    The Smiths' argument on this point is grounded in settled law and is well-taken. We conclude the District Court erred in excluding the conversation and failing to consider the legal import of statements made by Humble and Saubert.  The plain language of Rule 801(d)(2)(D) places Humble's statements outside the hearsay bar.  The parties' dispute as to the content of the conversation raises an issue of material fact regarding FUMIC's acceptance of the Smiths' payment, defeating FUMIC's entitlement to judgment as a matter of law on the Smiths' claims of oral contract or promissory estoppel.

¶26    In light of the above conclusions, a grant of summary judgment based solely on the Smiths' failure to timely remit payment would be improper under M. R. Civ. P. 56(c); however, this does not conclusively resolve whether the summary judgment in this case *was* improper, because of the claimed insufficiency of the Smiths' proffered payment. On the other hand, it *does* compel the conclusion that the Smiths likewise are not entitled to partial summary judgment, because the success of their claim hinges on disputed issues of fact.  While our reasoning differs from the District Court's, we will uphold a district court when it reaches the correct result, regardless of the court's reasoning.  *Stevens v. Novartis Pharms. Corp.*, 2010 MT 282, ¶ 28, 358 Mont. 474, 247 P.3d 244.

¶27    We thus turn to the District Court's alternate ground for awarding summary judgment in FUMIC's favor.

¶28    *Whether the District Court erred in concluding the Smiths' money order was an invalid method of payment.*

¶29    The District Court based its conclusion that the money order sent by Smith was invalid payment on two grounds: the order's purported failure to comply with Montana law on negotiable instruments by virtue of its lack of Smith's handwritten signature, and the order's failure to comply with the terms of the agreement contained on the order itself (also, primarily, for lack of Smith's handwritten signature). FUMIC's stated reason for denying the initial claim, similarly, was that "the money order was not signed, which is a prerequisite of both the issuing bank and Montana law to constitute a valid negotiable instrument."

¶30    We conclude that summary judgment in FUMIC's favor was improper for two reasons. First, we do not agree the order failed to constitute "payment" as a result of its noncompliance with the terms contained on the order itself. Second, the offer to reinstate coverage did not specify a manner of payment, i.e., a "valid negotiable instrument"; rather, it merely stated that reinstatement was conditional on "payment" being received by FUMIC. There is no requirement that "payment" be in the form of a "negotiable instrument" under Montana law. The District Court incorrectly equated strict compliance with the requirements of negotiability with the validity of payment.

¶31    As a preliminary matter, we agree with the District Court's conclusion that Smith's typed name on the money order did not constitute a "signature." Smith is correct that a *handwritten* signature is not required—a signature may be made "manually or by means of a device or machine," and may be "any word, mark, or symbol executed or

15

adopted by a person with present intention to authenticate a writing," under § 30-3-401, MCA. A small minority of courts have found a typewritten name or other mark sufficient. *See e.g. Sequoyah State Bank v. Union Nat'l Bank*, 621 S.W.2d 683, 684 (Ark. 1981); *Interfirst Bank Carrollton v. Northpark Nat'l Bank*, 671 S.W.2d 100, 104 (Tex. App.—El Paso 1984); *Mirabile v. Udoh*, 399 N.Y.S.2d 869, 871 (N.Y. Civ. Ct. Kings Co. 1977). The majority view, however, is that a type-written or embossed name, without some external mark, cannot be understood to "authenticate" the writing where, as here, the instrument requires an authorized signature in the "purchaser signer for drawer" space. *E.g. Triffin v. Travelers Express Co., Inc.*, 851 A.2d 667, 670 (N.J. Super. App. Div. 2004); James J. White & Robert S. Summers, *Uniform Commercial Code* § 16-3 (5th ed., Thomson/West 2008). We agree with the latter view, which is consistent with the statute's mandate for some mark or symbol to attest to the purchaser's intentions in completing the instrument. As well, this approach better protects the purchaser and drawer from loss in the event of theft.

¶32 We turn to the question whether noncompliance with the agreement contained on the order itself rendered it an invalid payment as a matter of law. We conclude it does not. An order, such as a bank check or money order, is "a written instruction to pay money signed by the person giving the instruction." Section 30-3-102(1)(f), MCA. The bank ordered in the draft to make payment is the "drawee," and the person who signs the draft ordering payment is the "drawer" (also sometimes called the "maker"). The drawee is primarily liable on the order, but the drawer is of "secondary" liability. Steve H. Nickles & Mary Beth Matthews, *Payments Law in a Nutshell* 56-57 (Thomson/West

16

2005) [hereinafter Nickles & Matthews, *Payments Law*].  That is, if the drawee refuses to make payment ("dishonors" the order), the payee may seek payment from the drawer instead.  An agent of the drawer, unmistakably signing on behalf of the drawer, does not incur personal liability.  James J. White & Robert S. Summers, *Uniform Commercial Code* § 16-5 (5th ed., Thomson/West 2008).

¶33    Here, Smith paid cash to Glacier Bank, in return for which Glacier Bank issued a money order on behalf of the drawer of the order, MoneyGram Payment Systems, Inc., a Minnesota money-order business ("MoneyGram").  MoneyGram, "the leading issuer of money orders in the U.S.,"[1] contracts with Glacier Bank and hundreds of other agents to sell its money orders for a fee.  When the orders are presented for payment, Boston Safe Deposit & Trust Co., the "drawee" bank, pays the orders out of an account MoneyGram maintains at the bank, just as the personal bank (drawee) of the writer of a personal check (drawer) pays the personal check out of that person's account.  A bank money order, then, functions like a check, except that it is drawn by the customer against the general credit of the bank rather than against an account the customer owns.  "The bank commits to the customer to pay the check, just as the bank promises in a deposit agreement to pay checks the customer draws against her own account."  Nickles & Matthews, *Payments Law* at 282.

---

[1]MoneyGram, *MoneyGram Corporate—Financial Paper Products*, http://www.moneygram.com/MGICorp/MediaRelations/BusinessOverviews/FinancialPaperProducts/index.htm (accessed Aug. 25, 2011).

¶34 MoneyGram, as the drawer, must sign the order to make it a negotiable instrument. Section 30-3-102(1)(f), MCA. It does so through the purchaser of the order. A MoneyGram customer signs his or her money order as MoneyGram's agent, rather than in his individual capacity. On the lower right-hand corner of the order here (the traditional "signature" area), a prompt instructs: "Purchaser Signer For Drawer," under which are spaces for the purchaser's address, city and state. Above this signature area, the order states, "Purchaser, by signing you agree to the service charge and other terms on the reverse side." Thus, the customer's signature completes the order and binds the customer to the stated terms of agency and contract with MoneyGram. The "Purchaser's Agreement" located on the back of the order contains the terms described in ¶ 7 of this Opinion.

¶35 The order also states,

> This Money Order will not be paid if it has been forged, altered or stolen, and recourse is only against the endorser. This means that persons receiving this Money Order should accept it only from those known to them and against whom they have effective recourse.

In sum, the order contains an agreement between Smith, the purchaser and agent of the drawer, and the drawer—MoneyGram. Arguably, it may also include FUMIC and its bank as recipients of the order from Smith. But it is *not* an agreement involving the entity primarily liable on the order: the drawee, Boston Safe Deposit & Trust Co., whose liability on the money order—as with any ordinary check—is delayed until the bank is asked to pay and either accepts or dishonors it. Nickles & Matthews, *Payments Law* at 57. Left unexplained by the District Court is why compliance or noncompliance with the

18

terms of the agreement between Smith and MoneyGram affects the validity of the payment received by FUMIC.

¶36 As other courts have understood, these "conditions" cannot be interpreted by a literal reading of their terms. Were this the case, the money order here would fail the test of negotiability even when fully completed, as the promise to pay is made conditional: "[t]his money order *will not be paid if* . . . ." Sections 30-3-104 and -105, MCA. "Money orders contain an unconditional promise or order to pay . . . even though they include legends cautioning that they would not be paid if they had been altered or stolen or if an endorsement was missing or forged, since the legends constitute nothing more than a statement of statutory defenses against payment." 11 Am. Jur. 2d *Bills and Notes* § 18 (2011); *see also Triffin v. Dillabough*, 716 A.2d 605, 608-10 (Pa. 1998). Similarly, the terms of the agreement between the purchaser and MoneyGram involve defenses to payment, and cannot be said to constitute conditions precedent to negotiability.

¶37 For these reasons, the order's validity as a method of payment cannot be determined by its compliance or noncompliance with the agreement between the drawer of the order (MoneyGram) and its agent/purchaser (Smith). As discussed below, neither does the order's compliance with the requirements of negotiability. Rather, the order's ability to actually serve as payment determines whether it is valid payment.

¶38 We begin with the observation that § 28-2-102, MCA, requires "sufficient cause or consideration" to create a contract; § 28-2-801, MCA, defines "good consideration" as "[a]ny benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be

19

suffered by the person, other than prejudice that the person is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise." Unsurprisingly, nowhere in this definition, nor any definition of "payment" in the offer to reinstate, is a valid negotiable instrument mentioned or required. Nor are we aware of any other authority, nor have we been cited to any, that requires "payment" to be in the form of a valid negotiable instrument. If Smith had obtained a U.S. Postal Service money order, for example—for which no signature line is even present—there can be no serious contention that such an order would not constitute "payment." FUMIC's citation to § 30-3-303, MCA, for the proposition that "[a]n instrument that has no value is not consideration for a contract," supports rather than undercuts the conclusion that it is the order's value, rather than its compliance with requirements of negotiability, that is determinative in the contract formation context.

¶39 Indeed, the weight of authority makes clear that it is the instrument's *actual* ability to serve as payment that is dispositive. That is, was the instrument paid upon proper presentation, or would it have been? "It is clear that where an insurer in fact accepts checks for premiums it may not thereafter contend that such acceptance was not good payment as of the date of acceptance, so long as the check is or would have been paid upon proper presentation." W.E. Shipley, *Receipt of Check for Insurance Premium as Preventing Forfeiture for Nonpayment*, 50 A.L.R.2d 630 (2010). As the Ninth Circuit recently explained:

> A check that is unsigned may be deposited by the recipient by endorsing on the reverse side of the check the payee's signature and guaranteeing to the bank the signature of the maker of the check. Specifically, [w]hen the

20

check is presented to the maker's bank, the bank accepts the check and transfers the funds. The maker who receives the debit on the bank statement will not contact the bank since he or she believed the check was signed. The bank is not, of course, obligated to deposit an unsigned check; rather, the bank may refuse to deposit a check not properly signed because, if that check were fraudulent or unauthorized by the payer, the bank faces possible liability. But the bank may honor the check. In accordance with these principles, at least one government agency accepts unsigned checks for processing . . . [t]hus, banks may and sometimes do accept unsigned checks.

*Blanco v. Holder*, 572 F.3d 780, 783-84 (9th Cir. 2009) (internal citations omitted). In *Dubost v. U.S. Patent & Trademark Office*, 777 F.2d 1561, 1565-66 (Fed. Cir. 1985), the Federal Circuit Court of Appeals rejected the argument that an unsigned check, failing to qualify as a negotiable instrument, was an insufficient method of payment when the type of payment required did not specify that the instrument be negotiable. The court opined,

[B]ecause the name of the depositor and its priority account number were printed on the check, had the PTO (Patent & Trademark Office) presented the check for payment, the record indicates that the bank would have encountered no difficulty in handling the transaction. Given the evidence submitted by petitioner by affidavit of an official of its bank that the check would have been honored had the PTO submitted it, the lack of negotiability is immaterial under the circumstances here. In this case, the unsigned check on counsel's account has been proved to have been as good as a signed check as far as payment to the PTO is concerned.

¶40    The bottom line, in our view, is that the order might have been honored were it to have been presented to the drawee bank; this alone demands the conclusion that summary judgment was improperly granted to FUMIC. In fact, had the offer to reinstate simply required "valid consideration" rather than "payment," the unique nature of a money order might well have satisfied the requirement as a matter of law even without Smith's signature. As the Iowa Supreme Court reasoned, quoting the intermediate appellate

21

court,

> Due to the very nature of a money order, signed or unsigned, it evidences a surrender of right or claim. The purchaser of a money order pays a sum of money and in return receives the order as evidence of payment. The surrender of claim or right to a specified amount of money is made at the time the money order is issued. If a purchaser neglects to sign the money order this would certainly affect the negotiability of the instrument; however it does not change the fact that the purchaser tendered money at some point in order for it to be issued. Thus, unlike a check, for instance, a money order by its very existence represents the surrender of a right[.]

*State v. Propps*, 376 N.W.2d 619, 622 (Iowa 1985) (citation omitted) (concluding that an unsigned money order fit the statutory definition of a financial instrument). "The only difference [between a money order and a personal check] is that [the money order's] amount is machine-impressed and it represents a specific deposit so any nonsufficient-funds risk is absent." Frederick H. Miller, *The Lawyer's Guide to Modern Payment Methods: ACH, Debit, Credit and More* 95 (Am. Bar Assoc. 2007). *See also Harrison v. McMahon*, 2004 U.S. Dist. LEXIS 9383 at **7-8 (D. Conn. May 24, 2004) (discussing Western Union's policy that its money orders, even if unsigned, are "valid financial instruments.").

¶41 We conclude that whether Smith submitted "payment" to FUMIC depends on whether the order would have been honored. As demonstrated by the record, this question presents a genuine issue of material fact. In the District Court, both parties submitted affidavits regarding what Glacier Bank would have done with the order. The Smiths produced evidence suggesting the bank *would* have honored the order, via the affidavit of James Ness, Glacier Bank's Chief Deposit Officer, who testified, "[a] signature is not a prerequisite of the validity of [a] money order . . . and the lack of a

signature has no bearing on whether Glacier Bank would have accepted it." FUMIC presented the affidavits of Tom Barker and Rial Gunlikson, recounting a conversation with Glacier Bank employees who indicated Glacier Bank would *not* have honored the order. Unless FUMIC does its banking at Glacier Bank, however, that bank presumably would never have been presented with the order. Further development of the record is needed to determine whether the order actually would have been honored, assuming it were presented by FUMIC, through normal channels, to the drawee bank.

¶42 If the finder of fact determines the order would have been honored, the Smiths' claim will prevail. Because FUMIC did not even attempt to present the order for payment, the fault for nonperformance (i.e., nonpayment) would lie with FUMIC alone. In that instance, FUMIC could not fault the Smiths for nonpayment, as it is well-settled that "one cannot prevent performance of a contract and then avail oneself of its non-performance." *Payne Realty & Hous. v. First Sec. Bank*, 256 Mont. 19, 28, 844 P.2d 90, 95 (1992); *see also* 17A Am. Jur. 2d *Contracts* § 686 (2011); *Bingham v. Stevenson*, 148 Mont. 209, 215, 420 P.2d 839, 842 (1966); § 28-1-1301, MCA.

## CONCLUSION

¶43 We conclude the District Court erred to the extent it based its grant of FUMIC's motion for summary judgment on the money order's failure to constitute valid payment. As explained above, the agreements contained on the money order itself do not operate to condition validity of the order on compliance therewith. In addition, even if the money order failed to comply with the Uniform Commercial Code, such failure does not necessarily give rise to a determination that the order did not constitute valid payment.

¶44 We further conclude the District Court erred to the extent it based its grant of summary judgment on the Smiths' supposed failure to timely submit payment to FUMIC. While we agree with the District Court that receipt by Treweek cannot be imputed to FUMIC, the court erred in excluding statements made by FUMIC's agent when considering whether FUMIC had timely accepted the payment. The conflicting statements presented by the parties raise a triable issue of fact.

¶45 We therefore conclude that FUMIC is not entitled to summary judgment, as genuine issues of material fact remain. This conclusion also leads us to affirm the District Court's denial of the Smiths' motion for partial summary judgment.

¶46 Affirmed in part, reversed in part, and remanded for further proceedings in accordance with this opinion.


/S/ BETH BAKER


We concur:


/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ JIM RICE
/S/ BRIAN MORRIS